**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 07-2072

DEAN LAMPMAN,

Plaintiff - Appellant,

v.

DEWOLFF BOBERG & ASSOCIATES, INCORPORATED; MIKE OWENS; LEON
ZEBROSKI,

Defendants - Appellees.

Appeal from the United States District Court for the District of
South Carolina, at Charleston.  David C. Norton, District Judge.
(2:06-cv-00062-DCN)

Argued:  January 28, 2009          Decided:  March 23, 2009

Before TRAXLER, DUNCAN, and AGEE, Circuit Judges.

Affirmed in part, reversed in part, and remanded by unpublished
opinion.  Judge Agee wrote the opinion, in which Judge Traxler
and Judge Duncan joined.

**ARGUED:** George J. Kefalos, GEORGE J. KEFALOS, P.A., Charleston,
South Carolina; William C. Cleveland, III, BUIST, MOORE, SMYTHE,
MCGEE, P.A., Charleston, South Carolina, for Appellant.  Thomas
Peter Gies, CROWELL & MORING, L.L.P., Washington, D.C., for
Appellees.  **ON BRIEF:** Jennifer G. Knight, CROWELL & MORING,
L.L.P., Washington, D.C., for Appellees.

Unpublished opinions are not binding precedent in this circuit.

AGEE, Circuit Judge:

## I.

Dean Lampman appeals from the award of summary judgment to DeWolff, Boberg & Associates, Inc. ("DBA"), Michael Owens, and Leon Zebroski (collectively "the Defendants") as to all of Lampman's claims against them and awarding the Defendants summary judgment on a counter-claim against Lampman. In the underlying action, Lampman challenged the enforceability of a non-competition clause contained in a revised employment and shareholders' agreement Lampman signed with DBA. He also contended the Defendants made negligent misrepresentations that induced him to sign the agreement. The Defendants' counter-claim asserted Lampman breached his contract with DBA by accepting employment that violated the terms of the non-competition clause. For the reasons that follow, we affirm the district court's judgment in part, reverse in part, and remand.

## II.

DBA, a South Carolina corporation, is a management consulting firm, which conducted business in the period relevant to this appeal in thirty-two states, as well as Europe, Mexico, Canada, Colombia, and Panama. The corporation represents that it occupies a special niche within its market because it both analyzes and implements management operating systems. Zebroski

2

is DBA's President and CEO, and Owens is its Executive Vice President.

Lampman began working for DBA in 1994 as a systems analyst, and was subsequently promoted to other positions. During the course of this employment, Lampman received fifty shares of DBA stock. Lampman's ownership of the stock was initially governed by a stock redemption agreement that permitted DBA employee shareholders who left the corporation to work for a DBA competitor as long as they did not acquire an equity interest in the competitor. The stock redemption agreement also provided that DBA would annually redeem in equal amounts over five years a former employee shareholder's outstanding stock. Although the stock redemption price was nominal, the former employee shareholder would continue to receive dividends on his remaining stock during the five-year period.[1]

In April 2004, DBA decided to implement a new, more restrictive, shareholders' agreement (the "Shareholders' Agreement") in order to respond to certain concerns regarding the protection of DBA's operations and, specifically, its

---

[1] It appears that DBA was, at least for the time periods relevant to this appeal, a subchapter S corporation for income tax purposes. A substantial portion of each shareholder's income who worked for DBA was derived from distributions of the corporation's income as dividends. Thus, the right to continue receiving dividends on a departed shareholder's unredeemed stock was a valuable asset to that shareholder under both the "old" and "new" stock redemption agreements.

business methodologies and strategies. Draft versions of a new agreement were circulated and discussed with the shareholders, including Lampman, during meetings that occurred in April and July 2004. In addition to restrictions on the transfer and redemption of DBA stock, the Shareholders' Agreement also contained specific provisions imposing shareholder covenants on the confidentiality of intellectual capital, noncompetition, and non-solicitation. In July 2004, the shareholders met to discuss the final version of the proposed Shareholders' Agreement. During the meeting, Owens and Zebroski indicated that the Shareholders' Agreement was in the "best interests" of DBA and its shareholders. Lampman joined other shareholders in signing the Shareholders' Agreement at that time. In consideration for entering into the non-competition provision, DBA promised to pay $5,000 to shareholders, like Lampman, with fewer than one hundred shares.

The Shareholders' Agreement became effective August 9, 2004. It continued the prior provision for redemption of a departing shareholder's stock in equal parts over five years, following the termination of a shareholder's employment with DBA, but now provided DBA the immediate right to redeem all of a shareholder's stock if the shareholder violated any portion of the non-competition clause or the provisions for confidentiality or non-solicitation. Such a redemption could significantly

4

impact a former shareholder because he would lose all future dividends.

In early August 2004, Lampman and Owens worked together on an assignment. Lampman avers that Owens cautioned him that he (Lampman) was "in Leon's cross hairs." Lampman stated he asked Owens if he should look for another job, and Owens responded that Lampman "should keep [his] head down and just keep doing a good job on analysis."[2] (Ex. J.A. 236-37.)

On August 23, 2004, Zebroski and Owens held a regularly-scheduled meeting with DBA's senior chiefs. Because the account upon which Lampman had been working unexpectedly terminated, one issue on the agenda was Lampman's reassignment to a new project. All the senior chiefs expressed their dissatisfaction with Lampman's performance and their unwillingness to work with him on future projects. Zebroski, the individual required to make the final determination as to Lampman's employment, had not previously considered firing Lampman. However, he decided during the course of the meeting that Lampman's employment

_____

[2] Owens avers this conversation did not occur. The district court proceeded on the assumption that Owens made these statements, properly considering whether summary judgment was appropriate when the evidence was viewed in the light most favorable to Lampman.

5

should be terminated immediately.[3]   Lampman was informed of this decision the same day.

Lampman began working for a DBA competitor, Synergetics Installations Worldwide, Inc., ("Synergetics") in October 2004. In April 2005, Lampman received dividends on his DBA stock in the amount of $31,969.   A few months later, after learning of Lampman's employment with Synergetics, DBA redeemed all of Lampman's remaining DBA stock, claiming it was entitled to do so under the Shareholders' Agreement because Lampman breached the noncompetition clause.   This redemption terminated the payment of any further dividends to Lampman.

In February 2006, Lampman filed a complaint in the United States District Court for the District of South Carolina asserting several causes of action against the Defendants based on the above-stated events.   Essentially, Lampman contended that the Defendants made negligent misrepresentations that induced him to execute the Shareholder's Agreement and that DBA breached the agreement.   The Defendants answered and filed a counter-claim for breach of contract based on Lampman's post-DBA employment with Synergetics.   DBA asserted this conduct violated

---

[3]   There is no evidence in the record contradicting Zebroski's testimony that he had not made any determination as to Lampman's employment status prior to the August 23, 2004 meeting.   Owens also states that he was unaware of any information suggesting that Lampman's termination was "imminent at any time prior to" August 23, 2004.   (Ex. J.A. 228, 256-62.)

the non-competition clause in the Shareholders' Agreement and entitled the corporation to repayment of the post-termination dividends paid to Lampman.

Lampman moved for partial summary judgment to declare the non-competition clause impermissibly overbroad and therefore void and unenforceable. The Defendants moved for summary judgment on all of Lampman's claims, as well as its counterclaim. After a hearing, the district court denied Lampman's motion for partial summary judgment and granted the Defendants' motions for summary judgment.

By order dated January 19, 2007, the district court held that statements at the shareholders' meeting that signing the Shareholders' Agreement was in the shareholders' "best interests" were expressions of opinion and therefore did not constitute "representations" that could support Lampman's claims for negligent misrepresentation. The district court further found no evidence that would support "an inference that [DBA] had already decided to terminate" Lampman's employment before the August 23 meeting. Lastly, the court held Owens' statement to Lampman was only a "subjective assessment of [Lampman's] work performance," and was not a factual representation showing that Lampman was going to be terminated. (J.A. 176-79.)

The district court also held that the non-competition provision was enforceable under South Carolina law. The

7

district court found that DBA presented uncontradicted evidence that it "occupies a unique, narrow niche of the type of business it engages in—and that it has a very limited set of direct competitors. . . . i.e., consulting firms that analyze and implement specific cost savings for businesses." (J.A. 173.) Therefore, the court concluded the non-competition clause was an appropriate means of protecting DBA's proprietary information and a satisfactory alternative limitation to a strictly geographic limitation on competition.

Pursuant to Federal Rule of Civil Procedure 59(e), Lampman moved to alter or amend the district court's judgment. He contended the district court failed to properly interpret the non-competition provision, erred in finding DBA occupied a narrow niche of the type of business in which it engages and has a limited set of direct competitors, and did not consider whether DBA's failure to disclose that Lampman was a "candidate for termination" prior to "consummation" of the Shareholders' Agreement represented a factual issue not susceptible to resolution by summary judgment.

By order dated September 26, 2007, the district court denied Lampman's Rule 59(e) motion. The court reiterated that the non-competition clause was enforceable under South Carolina law because it "only prohibited [Lampman] from working for a direct competitor in positions similar to the ones he held at

8

DBA," (J.A. 233), and where he was "most likely to use and share trade secrets and the proprietary information he used while employed by DBA." (J.A. 233.)

The district court then held that "[t]o the extent [Lampman's] negligent misrepresentation claim relies on an alleged <u>affirmative</u> misrepresentation, that allegation was disposed of in the prior order . . . ." (J.A. 234.) To the extent Lampman claimed that DBA wrongfully <u>withheld</u> information, the district court concluded Lampman's claim still failed. It noted Lampman "could not have justifiably relied on such an omission" because he was aware of poor performance reviews, he was an at-will employee, and there was no evidence that DBA planned to terminate Lampman's employment prior to the decision made on August 23, 2004.

Lampman noted a timely appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291 (West 2005).

III.

We review de novo a district court's award of summary judgment, viewing the facts in the light most favorable to the non-moving party.[4] <u>Lee v. York County Sch. Div.</u>, 484 F.3d 687, 693 (4th Cir. 2007). An award of summary judgment is

---

[4] In this diversity of jurisdiction case, we apply the substantive law of South Carolina.

9

appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Lee, 484 F.3d at 693.

We review for abuse of discretion the denial of a Rule 59(e) motion to alter or amend judgment. See Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 402 (4th Cir. 1998).

> Although Rule 59(e) does not itself provide a standard under which a district court may grant a motion to alter or amend a judgment, we have previously recognized that there are three grounds for amending an earlier judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice.

Id. at 403.


IV.

Lampman raises two main issues on appeal. First, he asserts the district court erred in awarding the Defendants summary judgment and subsequently denying his Rule 59(e) motion as to his negligent misrepresentation claims because there was a triable issue of fact as to whether Lampman justifiably relied on Owens' "negative response to the question of whether Lampman should look for another job" and whether DBA improperly failed

10

to tell Lampman that he was a "candidate for termination." Second, Lampman contends the district court erred in holding the non-competition clause was enforceable under South Carolina law. He maintains the provision is void as a matter of law because it lacks a geographic limitation and is "broader than necessary to protect DBA's legitimate interests."[5] For the reasons set forth below, we affirm the district court's judgment as to the first issue, but reverse as to the second issue.

## A. Negligent Misrepresentation

Lampman appeals the district court's determination that he could not assert a claim of negligent misrepresentation based on (1) Owens' statement that Lampman should keep on doing good work and to keep his head down; and (2) DBA's failure to inform Lampman that he was a "candidate for termination."[6]

---

[5] Lampman also asserts a third issue regarding his claim that the non-competition clause is unenforceable: that DBA breached the contract by failing to make the $5,000 payment as consideration for execution of that provision. The district court denied Lampman's claim on this issue. Because we find the non-competition clause is void as a matter of law, we need not address this argument.

[6] Although Lampman argued to the district court that Owens' and Zebroski's statements at the shareholders' meeting in July 2004 also formed the basis for a negligent misrepresentation claim, he does not make that argument on appeal. Accordingly, he has abandoned that argument and we do not review the district court's conclusion that those statements constituted non-actionable opinion. See Fed. R. App. P. 28(a)(9)(A); 11126 Balt. Boulevard, Inc. v. Prince George's County, 58 F.3d 988, (Continued)

11

To state a claim for negligent misrepresentation under South Carolina law, a plaintiff must allege (1) a false representation made by the defendant to the plaintiff, (2) the defendant's pecuniary interest in the statement, (3) breach of a duty of care owed by the defendant to the plaintiff, (4) justifiable reliance by the plaintiff on the representation, and (5) loss suffered as a result of such justifiable reliance. See Redwend Ltd. P'ship v. Edwards, 581 S.E.2d 496, 504 (S.C. Ct. App. 2003).

As the district court observed, to be actionable a representation must be a statement of fact rather than a statement of opinion. See Gilbert v. Mid-South Machinery Co., 227 S.E.2d 189, 193 (S.C. 1976). "[W]hat was susceptible of exact knowledge when the statement was made is usually considered to be a matter of fact." Id. at 193 (citation omitted). Moreover, "the representation must relate to a present or pre-existing fact and be false when made. The representation cannot ordinarily be based on unfulfilled promises or statements as to future events." Koontz v. Thomas, 511 S.E.2d 407, 413 (S.C. Ct. App. 1999) (internal quotation marks and citation omitted).

---

993 n.7 (4th Cir. 1995) (en banc) (involving predecessor to Federal Rule of Appellate Procedure 28(a)(9)(A)).

12

We find no error in the district court's conclusion that Owens' statement to Lampman that he should "keep his head down and just keep doing a good job" spoke to "Owens's subjective assessment of [Lampman's] work performance" and was therefore an expression of opinion. The statement provided Owens' viewpoint as to how Lampman could act in the future and was not "susceptible to exact knowledge." Furthermore, the record contains no evidence that at the time he spoke, Owens personally believed Lampman should be fired or that DBA was considering terminating Lampman's employment. Owens' statement therefore cannot be considered a "false representation" of any fact and cannot form the basis for a claim of negligent misrepresentation. It is thus unnecessary to consider whether Lampman justifiably relied on Owens' statement.

Lampman's contention that DBA's failure to inform him he was a "candidate for termination" constitutes negligent misrepresentation by omission also lacks merit. Under South Carolina law, the "[s]uppression of a material fact which one is duty bound to disclose is equivalent to a false []representation." Landvest Assocs. v. Owens, 274 S.E.2d 433, 434 (S.C. 1981). The record does not support such a claim in this case. First, Lampman was aware that his supervisors were dissatisfied with his performance because he had received negative performance reviews. Second, Lampman was an at-will

13

employee, a status not altered by the Shareholders' Agreement, therefore his employment could be terminated at any time. Furthermore, the Shareholders' Agreement specifically stated a shareholder's employment could be terminated at any time.[7] For these reasons, Lampman knew before signing the Shareholders' Agreement that DBA could terminate his employment without providing any notice, and he even knew that DBA may have a reason for doing so.

Finally, the record does not support an inference that the Defendants were considering whether to terminate Lampman's employment prior to the August 23, 2004 meeting. To the contrary, the evidence unequivocally shows that Zebroski first considered terminating Lampman's employment during the August 23 meeting upon learning that all of the senior chiefs were dissatisfied with Lampman's poor performance and did not want to work with him. Simply put, there is no evidence that the Defendants considered Lampman to be a "candidate for termination" prior to making the decision to terminate him, and consequently could not have had a duty to disclose that information to Lampman.

_____

[7] Section 19 of the Shareholders' Agreement states: "Nothing in this Agreement shall confer any right to any Shareholder to continue in the service as an employee of the Corporation or shall interfere in any way with the right of the Corporation to terminate the employment of any Shareholder at any time, with or without Cause." (Ex. J.A. 28.)

14

For all of these reasons, the district court did not err in awarding DBA summary judgment on Lampman's claim of negligent misrepresentation, and it did not abuse its discretion in denying Lampman's subsequent Rule 59(e) motion related to its disposition of those claims.

B. Non-Competition Clause

Lampman next contends the district court erred in holding that the non-competition clause in the Shareholders' Agreement was enforceable under South Carolina law. Specifically, Lampman asserts the clause is unenforceable because it does not contain a geographic limitation or a suitable substitute limitation, and is broader than necessary to protect DBA's legitimate interests. We review de novo the district court's interpretation of the non-competition clause. See Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004) (stating the district court's interpretation of a written contract is a question of law that is reviewed de novo).

To be enforceable under South Carolina law, a non-competition clause must be: (1) necessary for the protection of the legitimate interest of the employer; (2) reasonably limited in its operation with respect to time and place; (3) not unduly harsh and oppressive in curtailing the legitimate efforts of the employee to earn a living; (4) reasonable from the standpoint of

15

sound public opinion; and (5) supported by a valuable consideration. Stringer v. Herron, 424 S.E.2d 547, 548 (S.C. Ct. App. 1992). Non-competition agreements are disfavored under South Carolina law and are "critically examined and construed against the employer." Poole v. Incentives Unlimited, Inc., 548 S.E.2d 207, 209 (S.C. 2001); Cafe Assocs. v. Gerngross, 406 S.E.2d 162, 164 (S.C. 1991). Furthermore, South Carolina courts will not modify or "blue pencil" a non-competition clause so as to restate its terms in a way to make the agreement enforceable. If any provision fails to satisfy the standard set forth above, then the entire non-competition clause is void as a matter of law, although the clause may be severable from unrelated parts of a broader contract. See Somerset v. Reyner, 104 S.E.2d 344, 347-48 (S.C. 1958).

With these principles in mind, we review the non-competition clause in the Shareholders' Agreement, which provides in relevant part that:

> Each Shareholder agrees that he or she will not, directly or indirectly, engage in Competition with [DBA], without the express written consent of [DBA]'s Chief Executive Officer . . . for a period of three (3) years following the termination of his or her employment . . . for any reason . . . . For purposes of this Agreement, "Competition" shall mean, with respect to a given Shareholder, any of the following:
>
> . . . .
>
> (d)    Serving in any capacity, job or function (including as a proprietor, partner, owner, manager,

16

director, employee, consultant, contractor or agent) <u>for any Person</u> that analyzes, designs, modifies and implements management systems to improve productivity, quality, service and capacity levels that generates quantifiable financial savings, and <u>where such services are</u> competitive with or <u>similar to those that such Shareholder rendered</u> during his or her employment with [DBA]. [DBA]'s known competitors include the entities identified on <u>Exhibit D</u>[8] attached hereto, which may be amended from time to time.

(Ex. J.A. 20) (emphasis added).

In reaching its conclusion that the non-competition clause was enforceable, the district court found that the clause only prohibited Lampman from working for "one of DBA's 'direct competitors' (i.e., consulting firms that analyze and implement specific cost savings for business), but [permitted Lampman] to work for any other 'indirect competitor' of DBA here in South Carolina and anywhere else in the world." (J.A. 173.) The district court's finding that the non-competition clause only prohibited "direct competition" with "direct competitors" was central to its ultimate determination that the non-competition clause was enforceable.[9] The district court specifically stated

---

[8] Exhibit D lists eight "known competitors," and includes Synergetics, for whom Lampman began working after DBA terminated his employment. (Ex. J.A. 296.)

[9] The district court repeatedly referred to "the shareholder agreement's prohibition on working for DBA's 'direct competitors,'" (J.A. 173), "the non-compete provision only included competitors who participated in the same narrow subset of the business consulting world (i.e., those businesses that would benefit the most from discovering DBA's confidential information)," (J.A. 230), "[t]he non-compete provision mirrored (Continued)

17

that "[t]he prohibition on working for DBA's eight direct competitors . . . was narrow enough to serve as a valid substitute for a geographic limitation." (J.A. 173.) We disagree.

The district court's construction of the non-competition clause conflicts with its plain language. The clause specifically prevents a shareholder from "directly or indirectly[] engag[ing] in Competition with" DBA. Nothing in the non-competition clause limits its scope to the eight "direct competitors," including Synergetics, identified in the Shareholders' Agreement. Moreover, the clause's definition of "competition" has a much broader scope than the narrow restrictions envisioned by the district court.

Our review of the plain language of the non-competition clause compels us to conclude that it is void under South Carolina law and therefore unenforceable. The provision is not reasonably limited to protect DBA's legitimate interests and it

---

DBA's niche by prohibiting shareholders from working for any company that analyzed and implemented cost-savings programs," (J.A. 231), "the non-compete provision did not prohibit [Lampman] from working for companies that were not DBA's competitors," (J.A. 231), "DBA has a limited number of 'direct competitors' and the non-compete was drafted to encompass only those competitors," (J.A. 233), "[t]he non-compete only prohibited [Lampman] from working for a direct competitor in positions similar to the ones he held at DBA [and] was limited to 'direct competitors.'" (J.A. 233.)

18

lacks a reasonable geographic limitation or a valid substitute for a territorial restriction. Two examples highlight the non-competition clause's impermissible overbreadth.

First, the non-competition clause would prohibit Lampman from working for many entities that do not compete in the marketplace with DBA, even accepting the "market" as defined by DBA. Under the plain language of the clause, Lampman would be prohibited from working for "any Person" "in any capacity, job or function (including as a proprietor, partner, owner, manager, director, employee, consultant, contractor or agent)" where his duties were "competitive with or <u>similar to</u> those [he] rendered during his" employment with DBA.[10] (Ex. J.A. 20) (emphasis added). Ford Motor Company, for example, "analyzes, designs, modifies and implements management systems to improve productivity, quality, service and capacity levels that generates quantifiable financial savings" for the corporation's internal use and not in competition with DBA. (<u>Cf.</u> Ex. J.A. 20.) But it is exactly this type of service that the non-competition clause defines as "competition" and which Lampman would offer to Ford as an employee. If Lampman were Ford's

---

[10] The Shareholders' Agreement defines "Person" as "an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof." (Ex. J.A. 14.)

employee, and provided those services for Ford's internal use, the non-competition clause's definition of "competition" set forth in Section 6.2(d) of the Shareholders' Agreement would place him in breach of that covenant. Lampman would be "serving in any capacity" (as an employee) of Ford (a "Person"), which "analyzes, designs, modifies and implements management systems to improve productivity, quality, service and capacity levels that generates quantifiable financial savings" and "such services" of Lampman would be "similar to those . . . rendered during his . . . employment with" DBA. (Cf. Ex. J.A. 20.) Even though Ford could not be deemed a direct or indirect competitor of DBA, Lampman's employment would nonetheless violate the plain terms of the non-competition clause. The clause is therefore broader than necessary to achieve the protection of DBA's legitimate interests.

Second, the non-competition clause would prohibit Lampman from providing "competitive . . . or similar" services anywhere in the world, even in places where DBA concedes it conducts no business and would not be deprived of a client if Lampman serviced a customer in that location. During the hearing on the motion for summary judgment, the court conducted the following colloquy with counsel for DBA:

> The Court: So, Mr. Lampman could have gone to Africa to Zimbabwe and worked for Synergetics?

Mr. Gies: No, he could not have. It's definitely a global restriction.

The Court: Even though y'all aren't working in Zimbabwe?

Mr. Gies: Yes.

(J.A. 138.) The plain language of the non-competition provision shows DBA's construction is correct. In the example, Lampman would be providing services "competitive with or similar to those . . . rendered during his . . . employment" to a Person – his customer – even if that customer were not a client of DBA's.

The non-competition clause thus would prohibit Lampman from working for a "competitor" in Zimbabwe, even though DBA does not provide services in that country and has no legitimate interest in prohibiting Lampman from working there. "To be considered reasonable, a territorial restriction must not cover an area any broader than is necessary to protect the employer's legitimate interest." Stringer, 424 S.E.2d at 548; Standard Register Co. v. Kerrigan, 119 S.E.2d 533, 539 (S.C. 1961). Because the non-competition clause lacks any geographic limitation or a valid substitute for such a restriction, prohibits Lampman's employment with entities which do not compete with DBA, and because DBA lacks a legitimate interest in prohibiting competition in portions of the world in which it does not

21

operate, the clause is void as a matter of law and therefore unenforceable.[11]

The district court thus erred in granting DBA summary judgment as to Lampman's claims because the void non-competition clause cannot act as a bar to his claims. Similarly, the district court erred in granting summary judgment as to DBA's counter-claim because it is dependent on the enforceability of the non-competition clause.

V.

For all the foregoing reasons, we affirm the district court's award of summary judgment to DBA on Lampman's claim of

---

[11] We note that in its consideration of the non-competition clause, the district court relied on its view that enforcement of the non-competition clause was necessary to DBA's ability to protect "the trade secrets and proprietary information it has developed." (See, e.g., J.A. 232-33.) However, even though the Shareholders' Agreement contains specific confidentiality and non-solicitation provisions, DBA has never asserted Lampman breached those covenants. The district court's findings as to the non-competition clause's validity were also in error to the extent that its determination was based on a non-existent breach of covenants not before the court in this case. Moreover, where a non-competition clause is designed to protect an employer's trade secrets and business methods, its terms must still be reasonable. See Oxman v. Sherman, 122 S.E.2d 559, 561-62 (S.C. 1961). DBA's interest in protecting its "trade secrets and proprietary information" does not remove from it the responsibility of crafting a non-competition clause that is no broader than necessary to protect those interests and that only places reasonable limits on its territorial scope. As the nondisclosure and confidentiality provisions of the Shareholders' Agreement are not before us in this appeal, we express no opinion as to those provisions.

negligent misrepresentation. We reverse the district court's award of summary judgment to DBA on Lampman's breach of contract and conversion claims. And we also reverse the award of summary judgment to DBA on its breach of contract counter-claim. Lastly, we remand this case for further proceedings consistent with this opinion.

<u>AFFIRMED IN PART,</u>
<u>REVERSED IN PART,</u>
<u>AND REMANDED</u>